# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MARYLAND

| | |
|---|---|
| JAMES HOOSE, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> GENVEC, INC., WAYNE T. HOCKMEYER, WILLIAM N. KELLEY, STEFAN D. LOREN, QUINTEROL J. MALLETTE, MICHAEL RICHMAN, MARC R. SCHNEEBAUM, DOUGLAS J. SWIRSKY, INTREXON CORPORATION, and INTREXON GV HOLDING, INC., <br><br> Defendants. | Civ. No. _____ <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff James Hoose ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### INTRODUCTION

1.      Plaintiff brings this action on behalf of himself and the public stockholders of GenVec, Inc. ("GenVec" or the "Company") against GenVec's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On January 24, 2017, GenVec, Intrexon Corporation ("Parent"), and Intrexon GV Holding, Inc. ("Merger Sub," and together with Parent, "Intrexon") announced that they had entered into a definitive agreement ("Merger Agreement") under which Intrexon will acquire all of the outstanding shares of GenVec in an all-cash transaction (the "Proposed Transaction"). If

consummated, GenVec stockholders will receive 0.297 shares of Intrexon common stock and one contingent payment right ("CPR") entitling each holder to receive an amount in cash, or potentilly Intrexon common stock, equal to (i) 50% of (a) all milestone payments, if any, made by Novartis Institutes for BioMedical Research, Inc. ("Novartis") for milestones that are achieved or occur under the Research Collaboration and License Agreement between GenVec and Novartis, dated January 13, 2010 (the "NVS License Agreement"), during the 36-month period following the effective time of the Proposed Transaction, and (b) all royalty payments, if any, made by Novartis under the NVS License Agreement during such 36-month period, divided by (ii) all then-outstanding CPRs.

3.      Based on Intrexon's stock price as pf January 23, 2017, the implied value of the stock-based merger consideration was $6.56 per share.  As of the close of trading on March 30, 2017, however, the stock-based merger consideration is worth only $5.85 per share.

4.      On March 17, 2017, Defendants issued materially incomplete and misleading disclosures in the Form S-4 Registration Statement (the "Proxy") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  The Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

5.      Accordingly, Plaintiff alleges herein that Defendants have breached their fiduciary duties and violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331–32, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

7. The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

**PARTIES**

9. Plaintiff is, and has been at all relevant times, the owner of shares of GenVec common stock.

10. GenVec is a corporation organized and existing under the laws of the State of Delaware. The Company maintains its principal executive offices at 910 Clopper Road, Suite 220N, Gaithersburg, Maryland, 20878. GenVec common stock trades on the Nasdaq under the ticker symbol "GNVC."

11. Defendant Wayne T. Hockmeyer ("Hockmeyer") has served as a director of the Company since December 2000. Defendant Hockmeyer served as Chairman of the Board from November 2013 until October 2016.

12. Defendant William N. Kelley ("Kelley") has served as a director of GenVec since June 2002.

13. Defendant Stefan D. Loren ("Loren") has served as a director of GenVec since September 2013.

14. Defendant Quinterol J. Mallette ("Mallette") has served as a director of GenVec since October 2014.

15. Defendant Michael Richman ("Richman") is a director of GenVec. Defendant Richman has served as Chairman of the Board since October 20, 2016.

16. Defendant Marc R. Schneebaum ("Schneebaum") has served as a director of GenVec since April 2007.

17. Defendant Douglas J. Swirsky ("Swirsky") has served as a director, President, and Chief Executive Officer ("CEO") of GenVec since September 2013.

18. Defendants Hockmeyer, Kelley, Loren, Mallette, Richmanm, Schneebaum, and Swirsky are collectively referred to as Individual Defendants and/or the Board.

19. Non-party Parent is a Virginia corporation headquartered at 20374 Seneca Meadows Parkway, Germantown, Maryland, 20876. Parent common stock trades on the New York Stock Exchange under the ticker symbol "XON."

## CLASS ACTION ALLEGATIONS

20. For purposes of the breach of fiduciary duties claims, Plaintiff brings this action individually and as a class action on behalf of all holders of GenVec stock who are being, and will be, harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendant.

21. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

4

22. The Class is so numerous that joinder of all members is impracticable. As of September 23, 2017, GenVec had 22,736,316 shares of common stock outstanding. These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

23. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

    a. whether Defendants have violated Sections 14 and 20 of the Exchange Act in connection with the Proposed Transaction; and

    b. whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

24. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

25. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

26. The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

27. Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

28. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

29. Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FURTHER SUBSTANTIVE ALLEGATIONS

**Company Background and Potential for Growth**

30. GenVec is a clinical-stage biopharmaceutical company based in Maryland. It is a pioneer in the design, testing and manufacture of adeno-vectored product candidates for gene-based medicine. The primary current product candidate is labelled CGF166 and licensed to Novartis for Phase 1 and 2 clinical study in the treatment of hearing loss and balance disorders.

31. The Company also licenses its proprietary platform for the development and manufacture of therapeutics and vaccines to other companies in the biopharmaceutical industry.

**The Sale Process**

32. GenVec began considering selling the Company in May 2016 when Thomas Reed, Ph.D., Founder and Chief Science Officer of Intrexon, met with Individual Defendant Swirsky, President and CEO of GenVec, to discuss the possibility of a strategic transaction between GenVec and Intrexon.

33. Following continued discussion over the next several months, on November 22, 2016, Intrexon delivered an indication interest, requesting exclusive negotiations for due diligence. The Proxy does not disclose any of the terms contained in the indication of interest.

34. The Board met on November 25, 2016 and authorized Defendant Swirsky to enter into an exclusivity agreement and negotiate with Intrexon. The companies executed an exclusivity

6

agreement on November 29, 2016 set to last until January 23, 2017. The exclusivity agreement forbid GenVec from soliciting any other interest in a potential strategic transaction.

35.     Intrexon delivered a non-binding proposal on December 28, 2016 for an all-stock transaction at a price between $3.75 and $3.85 per share of GenVec stock. The Board rejected this proposal.

36.     On January 20, 2017, Intrexon delivered a revised proposal for an all-stock transaction with a value of $6.00 per share and a CVR for the Novartis license agreement. Intrexon increased the stock portion of the consideration to $7.00 per share after rounds of counteroffers, plus fifty-percent of the milestone payments received under the Novartis license agreement. Defendant Swirsky agreed without consulting the Board, and the parties negotiated the rest of the merger documents.

37.     The Board met on January 21, 2017 and agreed to move forward with plans to merge with Intrexon, even without an independent valuation of the Company. The Board then determined to engage a financial advisor strictly for the purpose of obtaining a fairness opinion. The Board authorized the engagement of Roth Capital Partners, LLC ("Roth") for this purpose.

38.     During this meeting, the Board also created a special committee of directors to continue negotiating the merger. The Proxy states that the Board's legal counsel "advised the GenVec board of directors of its considerations in connection with a potential conflict of interest if Intrexon were to offer the executives of GenVec employment with Intrexon prior to the closing of the transaction with Intrexon."

39.     In a rush to sign a deal with Intrexon, and without contacting any other potentially interested parties, the Board negotiated the terms of the Merger Agreement over the next three

7

days. In that same short time period, Roth prepared valuation analyses underlying its fairness opinion.

40. Roth then presented that fairness opinion and analysis to the Board during a meeting on January 24, 2017.

41. After receiving Roth's opinion that the merger consideration was financially fair, the Board approved the Proposed Transaction and authorized the execution of the Merger Agreement.

42. Following the meeting, the Company and Intrexon executed the Merger Agreement and other transaction documents.

43. The two companies then issued a joint press release, reading in relevant part:

GERMANTOWN, Md., and GAITHERSBURG, Md., Jan. 24, 2017 /PRNewswire/ -- Intrexon Corporation (NYSE: XON), a leader in the engineering and industrialization of biology to improve the quality of life and health of the planet, today announced that it has entered into a definitive agreement to acquire GenVec, Inc. (NASDAQ: GNVC), a clinical-stage company and pioneer in the development of AdenoVerse™ gene delivery technology.

Intrexon intends to integrate and expand upon GenVec's expertise in adenoviral vectors and cGMP drug product manufacturing to enhance its broad gene transfer capabilities that encompass multiple viral and non-viral platforms. Notably, the combined technologies have the potential to yield the next generation of adenoviral (AdV) delivery through the creation of a scalable manufacturing platform utilizing helper-dependent adenovirus with significantly higher payload capacity of >30kb, as compared to current viral delivery methods ranging from 4.5kb – 9kb.

Thomas D. Reed, Ph.D., Intrexon's chief science officer commented, "Our acquisition of GenVec will mark our continuing commitment to add gene delivery platforms that complement our multigenic control systems. Intrexon's proficiency in using various viral as well as non-viral transfer techniques to integrate our gene programs affords us the capability to pursue an array of in vivo and ex vivo gene and cell therapy approaches, and the addition of a helper-dependent adenoviral system with a substantial payload capacity dramatically expands the types of in vivo therapeutic programs we can pursue."

"GenVec has contributed significantly to advancements in gene therapy through its AdenoVerse technology, and over 3,000 clinical trial subjects have received their

therapeutics and vaccines across the globe. We are enthusiastic to begin working alongside their highly accomplished research and drug development team," added Dr. Reed.

"After a detailed and careful evaluation, our board of directors believes that this is the best alternative to maximize value for GenVec's shareholders," said Douglas Swirsky, GenVec's president and CEO. "We expect that the strong scientific synergies, coupled with Intrexon's extensive resources, will help unlock the true potential of the AdenoVerse platform."

Through an AdV-based vector, Intrexon has already delivered the first clinically validated transcriptional gene switch utilizing the RheoSwitch Therapeutic System® to regulate the expression and concentration of a powerful cytokine, interleukin-12, to treat cancer. Intrexon's gene control systems combined with the array of GenVec's AdV-based technology is projected to accelerate its ability to develop cutting-edge gene therapies that regulate in vivo expression of multiple therapeutic effectors.

Additionally, GenVec's selection of vector origins and serotypes as well as know-how in specifying cellular and tissue targets is expected to expedite the design and production of vectors that complement Intrexon's multigene programming and focus on safety with limited off-target effect.

Douglas E. Brough, Ph.D., GenVec's chief scientific officer stated, "We are excited to be joining the talented team at Intrexon. Utilization of their advanced synthetic biology tools and expertise is expected to enable the development of a manufacturing approach that will greatly increase the capacity of our expression cassettes to over 30kb. This next-generation delivery platform is anticipated to vastly exceed other viral delivery methods and accommodate Intrexon's advanced gene programming to target complex multi-gene disorders."

44. The Proxy is silent as to negotiations between Intrexon and GenVec or its executives as to the future employment of GenVec executives with the combined company.

**The Proxy Misleads by Omitting Material Information**

45. On March 17, 2017, GenVec filed the materially misleading and incomplete Proxy with the SEC. Designed to convince shareholders to vote in favor of the Proposed Transaction, the Proxy is rendered misleading by the omission of critical information concerning the process that resulted in the Proposed Transaction, the potential conflicts of interest faced by Company

9

management, the potential conflicts of interest faced by Roth, and the Company's expected future value as a standalone entity as evidenced by the Company's financial projections.

### *Potential Conflicts Facing Company Management*

46. The Proxy contains material misrepresentations and omissions regarding employment negotiations taking place in the lead up to the Merger Agreement.

47. The Proxy fails to disclose the timing and nature of all communications regarding future employment and/or directorship of GenVec's officers and directors, including who participated in all such communications.

48. Specifically, the Proxy indicates that "GenVec's directors and executive officers may have interests in the merger that are different from, or in addition to, the interests of shareholders," including "potential continued employment of executive officers following the merger." Further, the Proxy states that, on January 21, 2017, the Board's legal counsel "advised the GenVec board of directors of its considerations in connection with a potential conflict of interest if Intrexon were to offer the executives of GenVec employment with Intrexon prior to the closing of the transaction with Intrexon." Additionally, on January 22, 2017, the special committee met and discussed Intrexon's proposed merger agreement, including provisions with respect to "employment matters."

49. Immediately after entry into the Merger Agreement, in the joint press release announcing the Proposed Transaction, GenVec's chief scientific officer, Douglas E. Brough, Ph.D., stated: "We are excited to be joining the talented team at Intrexon."

50. Despite these indications that Intrexon will retain certain members of Company management following the close of the Proposed Transaction, the Proxy fails to disclose the nature

and timing of these conversations, as well as the amount of compensation that GenVec's retained employees expect to earn.

51. The Proxy materially misleads GenVec stockholders when it omits discussions of the post-merger operation of GenVec, and when it omits facts concerning prior communications between Intrexon and any members of GenVec management regarding post-transaction retention of GenVec's management. The fact that GenVec management could state in its press release that it was joining the team at Intrexon indicates such communications had been exchanged prior to the execution of the Merger Agreement.

52. The failure to disclose the content and timing of such discussions materially misleads GenVec stockholders as to the appropriateness of the Board's decision to not conduct any kind of further market check with respect to the merger price, and the potential conflicts of interest faced by Company management in supporting the merger.

53. The omitted information concerning the timing, content, and parties involved in these communications concerning the retention of GenVec's management would significantly alter the total mix of information that Defendants used to promote the Proposed Transaction, because the conflicts of interests created and fostered by such communications would affect the stockholders' perception and analysis of the entire process and the ultimate fairness of the Proposed Transaction. Thus the statements in the Proxy are rendered materially misleading by these omissions.

### *Potential Conflict of Interest Facing Roth*

54. The Proxy is rendered materially misleading by the omission of material information concerning the potential conflicts of interest faced by Roth in acting as the Company's financial advisor.

55. The Proxy discloses that "Roth in the past has provided and may in the future provide investment banking and other financial services to GenVec and its affiliates for which Roth and its affiliates have received, or, in the case of future services, may receive, compensation." However, the Proxy omits the nature and timing of those services, as well as the compensation earned in connection with those past services.

56. The Proxy also fails to disclose whether Roth provided any services to, or received any compensation from, Intrexon in the past.

57. These omissions directly impugn the independence of Roth and materially mislead GenVec stockholders as to the ability of Roth to act in the best interest of GenVec and its stockholders when providing financial advice leading up to the Proposed Transaction. By omitting this information, the Proxy permits the inference that Roth has not performed any services for Intrexon without any affirmative statement regarding potential services. If Roth has not been engaged or compensated by Intrexon, the Proxy must affirmatively reflect those facts.

*Failure to Reconcile Non-GAAP Financial Measures*

58. The Proxy fails to disclose material information concerning the Company's financial projections. First, the Proxy discloses several non-GAAP accounting metrics for projected financial information over the years 2017-2024 for the CGF166 & FMD programs. However, providing these non-GAAP metrics without disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projections to GAAP measures, makes the provided disclosures materially incomplete and misleading. While the Proxy provides net income and cash flows for these business segments within the Company, it omits the information necessary to reconcile these to GAAP measures. Non-GAAP measures have no universally understood

definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance.

59.     Because of the non-standardized and potentially manipulative nature of non-GAAP measures, when a company discloses information in a Proxy that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

60.     SEC regulations explicitly require companies to provide any reconciling metrics for non-GAAP financial measures where such reconciling metrics are available without unreasonable efforts. 17 C.F.R. 229.10(e)(1)(i). The Proxy makes no effort to account for the failure to reconcile these non-GAAP measures to GAAP metrics.

61.     Without disclosure of these reconciling metrics, the Proxy violates SEC regulations and materially misleads GenVec stockholders.

*Misleading Statements and Omissions Regarding the Company's Financial Projections*

62.     The Proxy discloses "Prospective Financial Information" that was provided to the Board. Although the Proxy purports to show the risk adjusted "cash flows" of GenVec's CGF166 and FMD programs, it fails to disclose the Company's standalone unlevered free cash flow projections and the line items used to calculate those projections.

63.     Additionally, the Company fails to disclose the net operating loss ("NOL") carry forwards of $253 million disclosed in previous SEC filings, and whether the Company's financial advisors incorporated the NOLs into account in their valuation analyses.

64.     These omissions of material information make the Proxy false and misleading to GenVec stockholders regarding the disclosures of both the projections of financial information and the financial analyses performed by Roth underlying the fairness opinion.

65. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and GenVec**

63. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

64. The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. GenVec is liable as the issuer of these statements.

65. The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

66. The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

67. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

68. The Proxy is an essential link in causing Plaintiff and the Company's stockholders to approve the Proposed Transaction.

69. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

70. Because of the false and misleading statements in the Proxy, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

71. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72. The Individual Defendants acted as controlling persons of GenVec within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of GenVec and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

73. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

74. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of the

Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy.

75. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

76. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

D. Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

F. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 31, 2017               LEVI & KORSINSKY LLP

/s/ Donald J. Enright
Donald J. Enright (#013551)
Brian D. Stewart (#19906)
1101 30th Street NW
Suite 115
Washington, D.C. 20007
Telephone:    (202) 524-4290
Facsimile:    (202) 333-2121

*Counsel for Plaintiff*